UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIGUEL ANGEL CORBACHO DAUDINOT

             Plaintiff,                    CASE NO.

v.

YASIEL PUIG VALDES a/k/a YASIEL PUIG       **COMPLAINT**
and MARITZA VALDES GONZALEZ.

             Defendants.          JURY TRIAL DEMANDED
_____/

       Plaintiff, by and through the undersigned counsel, the LAW OFFICES OF AVELINO J. GONZALEZ, P.A., complaining of the Defendants, respectfully allege upon information and belief as follows:

## INTRODUCTION

       This is an action seeking damages for prolonged arbitrary detention and torture of Plaintiff, MIGUEL ANGEL CORBACHO DAUDINOT ("CORBACHO DAUDINOT") committed by defendants YASIEL PUIG VALDES a/k/a YASIEL PUIG ("PUIG") and MARITZA VALDES GONZALEZ ("VALDES"), their officers, directors, agents, servants and employees, acting in concert with, aiding, abetting, facilitating, soliciting, directing, orchestrating and conspiring with the Cuban government and its collaborators in the commission of these acts, in violation of the laws of the United States of America.

## JURISDICTION

       1.     The Court has subject matter jurisdiction over this case under the Torture Victim Protection Act of 1991 (TVPA) 28 U.S.C. § 1350, note,§ 2(a) and 28 U.S.C. § 1331 (Federal Question Jurisdiction).

       2.     Plaintiff MIGUEL ANGEL CORBACHO DAUDINOT ("CORBACHO") is a citizen of the Republic of Cuba and a legal Permanent Resident of the Dominican Republic.

3.     Defendant PUIG is a Cuban citizen and a United States Resident, whose permanent residence is 5720 SW 128 Street, Miami, Florida 33156.

4.     Defendant VALDES   is a Cuban citizen paroled in the United States, whose permanent residence is 5720 SW 128 Street, Miami, Florida 33156.

5.     The amount in controversy, both individually and collectively, exceeds $75,000.

## THE PARTIES

6.     Plaintiff CORBACHO DAUDINOT is a Cuban citizen, who was sentenced to a 7-year prison sentence in Cuba, under inhumane conditions, for a crime he did not commit because of Defendants' accusations of Plaintiff with the National Institute of Sports, Physical Education and Recreation (*Instituto Nacional De Deportes, Educación Fisica, y Recreación*) ("INDER"), their denunciations to officials from the repressive Cuban Department of State Security (*Departamento de Seguridad del Estado*) ("DCSE") and because of the testimony Defendants presented against Plaintiff at a 30-minute trial, which followed no rules of evidence or due process, and which was deliberately skewed against Plaintiff. Plaintiff's treatment in prison was cruel, degrading, unsanitary, and tortuous. Please find as "**Exhibit A**" the signed denunciation of PUIG; as "**Exhibit B**" the signed denunciation of VALDES; and, as "**Exhibit C**" the Cuban Court's sentence of CORBACHO DAUDINOT.

7.     At all times hereinafter mentioned, PUIG was and is an internationally acclaimed baseball player, and a Cuban citizen, who of his own volition informed authorities of the INDER about alleged illegal activities committed by Plaintiff, and filed a complaint to DCSE against CORBACHO DAUDINOT, which led to the arrest, detention and torture of Plaintiff. PUIG testified against Plaintiff at a Cuban criminal trial, which led to Plaintiff's continued incarceration and torture. PUIG defected from Cuba in 2012, was subsequently retained by the Major League Baseball team, the Los Angeles Dodgers, and maintains a permanent residence in Miami, Florida.

8.     At all times hereinafter mentioned PUIG's actions against Plaintiff were motivated by a desire to clear his name with the Cuban authorities in order to get back onto the Cuban national baseball team and the Cuban national Series team in order to further his career and effectuate his escape so that he could play professional baseball abroad. PUIG was

sanctioned from playing in the Cuban national baseball team and the Cuban national Series team of Cienfuegos in 2009.

9.      At all times hereinafter mentioned, VALDES was and is PUIG's mother and a Cuban citizen, who of her own volition informed authorities of the INDER about alleged illegal activities she suspected were being committed by Plaintiff, and filed a sworn witness declaration in support of her son's sworn statements against CORBACHO DAUDINOT, and testified against him in a Cuban criminal trial, all of which led to the initiation and the continuation of Plaintiff's detention and torture. Upon information and belief, VALDES left Cuba at the end of 2012 or the beginning of 2013. She lives with her son and maintains a permanent residence in Miami, Florida.

10.      At all times hereinafter mentioned, VALDES's actions against Plaintiff were motivated by a desire to clear PUIG's name with the Cuban authorities in order to get back onto the Cuban national baseball team and the Cuban national Series team in order to further his career and effectuate his escape so that he could play professional baseball abroad. PUIG was sanctioned from playing in the Cuban national baseball team and the Cuban national Series team of Cienfuegos in 2009

11.      At all times relevant herein, PUIG conspired with his mother, with named and unnamed agents of the INDER and of the repressive DCSE and with the Cuban government to commit arbitrary and prolonged detention and torture of Plaintiff, CORBACHO DAUDINOT.

12.      At all times relevant herein, VALDES conspired with her son, with named and unnamed agents of the INDER and of the repressive DCSE and with the Cuban government to commit arbitrary and prolonged detention and torture of Plaintiff, CORBACHO DAUDINOT.

13.      At all times relevant herein, PUIG aided and abetted named and unnamed agents of the INDER, the repressive DCSE and the Cuban government to commit arbitrary and prolonged detention and torture of Plaintiff, CORBACHO DAUDINOT.

14.      At all times relevant herein, VALDES aided and abetted named and unnamed agents of the INDER, the repressive DCSE and with the Cuban government to commit arbitrary and prolonged detention and torture of Plaintiff, CORBACHO DAUDINOT.

15.     At all times relevant herein, Defendants worked deeply with the INDER and with the DCSE to report, to set up and to frame Plaintiff of the crime of Human Trafficking in order to allow PUIG to appear as if he were a loyal and trustworthy Cuban citizen in order to re-enter the Cuban nationalTeam and the Cuban nationalSeries team of Cienfuegos.

16.     At all times relevant herein, Defendants acted based on a demonstrated pattern of a mutually beneficial relationship between the state, the athlete, and the athlete's family, where the athlete and his or her family act as informants for the state against alleged attempts at human trafficking in exchange for preferential treatment for the athlete and his or her family or in order for the athlete to be allowed to practice his or her sport in Cuba's major "amateur" leagues and/or travel abroad while competing in the sport.

17.     At all times relevant herein, the pattern of collusion between athletes, their families, and the state was demonstrated in the related cases of *Curbelo Garcia et al v. Chapman*, case number 12-CV-21891, and Curbelo Garcia et al v. Bennett, 13-CV-22210, before judge Cecilia Altonaga. As part of the relevant facts of those cases, the famous closing pitcher for the Cincinnati Reds, Aroldis Chapman, and his parents, accused at least four (4) men of Human Trafficking for allegedly having offered Chapman to illegally remove him from the island. As in the case at bar, at the time he made his accusations against those men, Chapman was also under sanctions which forbade him from playing in the on the Cuban national baseball team as well as from the Cuban national Series team. Just as in the case at bar, Chapman was immediately reinstated in the National Series team as soon as he made the denunciations against those men.

18.     At all times relevant herein, PUIG, due to being an integral part of the INDER and a talented baseball player, knew of Chapman's previous sanctions, which were widely known due to the fact that he was removed from the national team just as that team was set to head to the 2008 Olympics.

19.     At all times relevant herein, PUIG, due to being an integral part of the INDER and a talented baseball player, knew that Chapman had managed to clear his own name after he had been caught attempting to escape from Cuba in 2008 and had accomplished the removal of the sanctions he'd had against him that prohibited him from playing baseball by accusing others of human trafficking.

20.     At all times relevant herein, Chapman's defection from Cuba on July 1, 2009 made headlines in the island of Cuba, with the National newspaper Granma confirming his escape on July 10, 2009, referring to those who helped Chapman escape as thieves and the Cuban exiles who lived in the United States as mafia.

## VENUE

21.     Venue is proper in the Southern District of Florida pursuant to 28 USC § 1391 (a) and (b) in that this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred and Florida is the state where Defendants each maintain a permanent residence.

## ALLEGATIONS OF FACT COMMON TO ALL COUNTS

The following allegations of fact are derived from Cuban public documents, from the Defendants' sworn DCSE declarations and the court testimony of PUIG and his mother, VALDES  in Cuban court, from witness testimony given in Cuban court, and eye-witness accounts of the events as they occurred, and from filed Court documents in the Republic of Cuba.

22.     PUIG tortuously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently caused and/or otherwise proximately caused the arbitrary and prolonged detention and torture of CORBACHO DAUDINOT.

23.     VALDES tortuously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently caused and/or otherwise proximately caused the arbitrary and prolonged detention and torture of CORBACHO DAUDINOT.

24.     PUIG aided and abetted the DCSE and the Cuban government in tortiously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently and/or otherwise proximately causing the arbitrary and prolonged detention and torture of CORBACHO DAUDINOT.

25.     VALDES aided and abetted the DCSE and the Cuban government in tortiously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently and/or otherwise proximately causing the arbitrary and prolonged detention and torture of CORBACHO DAUDINOT.

5

26.     PUIG conspired with his mother, with the DCSE and the Cuban government in tortiously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently and/or otherwise proximately causing the arbitrary and prolonged detention and torture of CORBACHO DAUDINOT.

27.     VALDES conspired with her son, with the DCSE and the Cuban government in tortiously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently and/or otherwise proximately causing the arbitrary and prolonged detention and torture of CORBACHO DAUDINOT.

28.     PUIG ordered, directed, initiated, solicited and facilitated the arbitrary and prolonged detention and torture of CORBACHO DAUDINOT.

29.     VALDES ordered, directed, initiated, solicited and facilitated the arbitrary and prolonged detention and torture of CORBACHO DAUDINOT.

30.     The Defendants acted with the intent to assist in the detention and torture by the DCSE and the Cuban government and initiated and cooperated with them to assist in said actions.

31.     The Defendants' acts had a substantial effect upon the success of the wrongful acts of the DCSE and the Cuban government.

32.     The Defendants had actual and constructive knowledge that their actions assisted the DCSE and the Cuban government in the arbitrary and prolonged detention and torture of CORBACHO DAUDINOT.

33.     On January 20, 2010 CORBACHO DAUDINOT was arbitrarily arrested and detained by DCSE, in conspiracy with, ordered, directed, aided, abetted, solicited, and facilitated by PUIG, who made the initial accusations against the Plaintiff and signed a sworn declaration against the Plaintiff, and by VALDES , who reported Plaintiff's alleged acts to the INDER and attested as an eye witness to PUIG's initial accusation and signed a sworn eye witness declaration against the Plaintiff.

34.     At the time of the accusation PUIG was a player for the developmental team in Cienfuegos—*el equipo de desarrollo*—despite being a player of fame and distinction, as a result of being sanctioned.

6

35.     After his arrest on January 20, 2010, CORBACHO DAUDINOT was detained in prison without a hearing or trial for almost nine (9) months.

36.     On October 8, 2010, CORBACHO DAUDINOT was convicted for an 7-year prison sentence by the Cuban government, in conspiracy with, ordered, directed, aided, abetted, solicited, and facilitated by PUIG, who testified as a "victim" against Plaintiff at trial on October 8, 2010, and by VALDES, who testified as PUIG's eyewitness on October 8, 2010. CORBACHO DAUDINOT has so far spent more than three and a half (3 1/2) years in prison, undergoing torture while his health deteriorated, and his family suffered. He is still currently serving out his sentence under a program known as provisional liberty, where a prisoner carries out his sentence at his or her home, but has restricted freedom of travel, his whereabouts must always be known by authorities and he must report to the penitentiary officers monthly.

<u>FACTS LEADING UP TO CORBACHO'S ARBITRARY ARREST</u>

37.     In January 2010, CORBACHO DAUDINOT was a Cuban Citizen, who had residency in the Dominican Republic and lived in Cuba part of the time. He had a small business in the Dominican Republic importing and selling Cuban-made products in that country. His wife and son, however, lived full time in Havana, Cuba, where he traveled frequently and stayed in his wife's home. Due to the economic downturn, CORBACHO DAUDINOT's business exporting Cuban goods to the Dominican Republic was struggling and he spent long stretches in Cuba, where he was attempting to establish an agricultural business, tending to pigs and livestock.

38.     CORBACHO DAUDINOT had no experience, connection or relationship with the sports industry, nor was he associated with any corporation, entity or individual involved in or related to the sports industry.

39.     In January 2010, CORBACHO DAUDINOT was staying at his wife's home in Havana, Cuba, seeking to establish his new agricultural business in the Dominican Republic.

40.     As a resident of the Dominican Republic, CORBACHO DAUDINOT had privileges not afforded to other Cuban citizens. One such privilege was the right to rent a tourism car.

41.     On or about January 11, 2010, a man named LUIS ANDRES FAIRE ("FAIRE"), a Cuban-American who lives in New Jersey and also holds residency in the Dominican Republic, called CORBACHO DAUDINOT.

42.     FAIRE, who owns businesses and is financially wealthy, was a close friend of CORBACHO DAUDINOT since their infancy. FAIRE himself had several businesses dedicated to pigs and livestock in the Dominican Republic, a business that CORBACHO DAUDINOT hoped to enter.

43.     FAIRE called CORBACHO DAUDINOT to ask him for a favor. He told CORBACHO DAUDINOT that FAIRE's son-in-law, ALEXANDER OROZCO NOA ("OROZCO") was headed to Havana, where CORBACHO DAUDINOT was staying, from Ciego de Avila, Cuba, where OROZCO lived, and needed to rent a tourism car in order to go to Cienfuegos, Cuba. FAIRE asked CORBACHO DAUDINOT to rent the tourism car, which OROZCO would pay, and drive OROZCO to Cienfuegos. As a resident of the Dominican Republic, CORBACHO DAUDINOT could rent a tourism car, which was prohibited to OROZCO, who was only a citizen of Cuba. Hoping that FAIRE would help CORBACHO DAUDINOT establish his business, CORBACHO DAUDINOT agreed to rent the tourism car for OROZCO and drive him to Cienfuegos.

44.     On January 12, 2010, CORBACHO DAUDINOT, accompanied by OROZCO, rented a silver Geely tourism car and headed out to Cienfuegos.

45.     OROZCO directed him to drive to a location known as Elpidio Gomez, where OROZCO told him a man named YASIEL PUIG lived.

46.     When CORBACHO DAUDINOT and OROZCO reached PUIG's domicile, they found that it was empty and were about to leave, when a woman came out of a neighboring home and identified herself as PUIG's mother, VALDES.

47.     VALDES, noticing the tourism car, solicitously indicated that her son was at the baseball stadium and that they could find him there.

48.      OROZCO instructed him to drive to the baseball stadium, where they saw a man, who turned out to be PUIG, walking outside of the stadium.

49.     OROZCO exited the car and spoke with PUIG some distance away from CORBACHO DAUDINOT, who parked the car a short distance away, remained in the vehicle and did not hear their conversation.

50.     After speaking with PUIG, OROZCO and PUIG approached the car and OROZCO asked CORBACHO DAUDINOT through the driver's side window if he could borrow one hundred convertible pesos (CUC$100) that he would repay. Knowing that FAIRE would ensure that CORBACHO DAUDINOT was repaid, he lent OROZCO the CUC$100, and witnessed as OROZCO handed the money to PUIG.

51.     After handing PUIG the money, OROZCO got back into the car and CORBACHO DAUDINOT drove them back to Havana, and, once there, left the car in the possession of OROZCO. He never spoke with PUIG on that day. After that day, he did not hear any further news of PUIG until the day of his arrest.

52.     On January 20, 2010, CORBACHO DAUDINOT was arrested and put into prison.

CORBACHO DAUDINOT'S ARBITRARY
AND PROLONGED ARREST AND  DETENTION

53.     At 5:00am on July 20, 2008 CORBACHO DAUDINOT was sleeping in his wife's home in Havana, Cuba, where he was staying with his wife and then five-year-old son, when four official officials from the DCSE—one lieutenant coronel, two mayors and one first lieutenant named Yaser Moya, acting upon the accusations of PUIG and VALDES , arrested him and took him away without informing him, his family, or anybody else where they were taking him or why he was being taken away.

54.     The officials took him to Villa Marista prison, where they told him he was to be interrogated.   Meanwhile, the authorities conducted a search of his wife's home, which is prohibited by Cuban law because that home was not his valid home as listed in his official documents, including his Identification record and passport. Under Cuban law, the only places, where searches of a suspect are allowed, are a suspect's valid domicile as listed in his official documents.

55.     The officials took all of his identification papers and passport.

56.     On that same day, without informing his family, they transferred him to the DCSE investigation Unit in Cienfuegos, where they forced him to sign a detention certificate, and where for the following months he was subjected to a battery of interrogations and threats.

57.     During the long sessions of interrogation, they told him that they were going to confiscate all of his property and that they would imprison him for thirty (30) years because, they informed him, Yasiel Puig had told them that CORBACHO DAUDINOT had offered to take him out of the country.

58.     The room in which the interrogations took place had faulty lighting and they sometimes forced him to sign documents whose contents he was not aware and had no bearing of truth. He was interrogated at frequent and sporadic intervals, at any time of the day or night, and was never advised that he could have an attorney present at such interrogations. CORBACHO DAUDINOT was kept in constant discomfort, never fully being able to relax or to sleep, as guards would wake him when they saw him drift off.

59.     After thirty days of continual interrogations and threats, they transferred him to the provisional prison of Ariza in Cienfuegos, Cuba, where the government seemed content to forget about him, as he was never again informed about his case.

60.     Cienfuegos, Cuba is approximately one hundred and forty (140) miles from Havana, Cuba, which is the city of CORBACHO DAUDINOT's official domicile and where his family lives.

61.     Despite having confiscated his documents of identification and his passport, the government ignored his many pleas to be released prior to trial.

62.     After about approximately 6 months in the Cienfuegos prison, CORBACHO DAUDINOT was once again transferred to the DCSE investigation unit in Cienfuegos, where the state continued further interrogations against him. He remained there for approximately one week before he was returned to Ariza prison.

63.     The trial was finally held in Cienfuegos on October 8, 2010.

64.     Defendants had been kept abreast of CORBACHO DAUDINOT's continued detention because members of CORBACHO DAUDINOT's extended family had been to see Defendants on several occasions, informing them of CORBACHO DAUDINOT's condition in

10

prison, about how his family was suffering in the United States, and pleading with them to tell the truth in court.

## CORBACHO DAUDINOT'S TRIAL

65.     The trial was attended by CORBACHO DAUDINOT's wife, his mother, and his friends.

66.     The Cuban government was trying CORBACHO DAUDINOT for human trafficking under Title 15, Article 347.2 of the Cuban Penal Code, which states that "the same penalty (imprisonment from seven to fifteen years) will be incurred by any person who, without being authorized to do so and for profit, organizes or promotes exit from the national territory of people who are in it to third countries.

67.     The evidence produced by the prosecution against CORBACHO DAUDINOT was the testimony of PUIG and that of his mother, VALDES, who despite only witnessing CORBACHO DAUDINOT in the automobile and never in the presence of PUIG, testified that Plaintiff offered to take PUIG out of the country.

68.     The prosecution also presented the testimony of ROBERTO MARTINEZ AROCHE "MARTINEZ", the INDER's Deputy Director of the Provincial Sports in Cienfuegos, who testified that VALDES had gone to see him to inform him that CORBACHO DAUDINOT was offering to take her son out of the country illegally, and the testimony of LIVAN ANGARICA GONZALEZ ("ANGARICA"), the coach of Cuban national Series baseball team of Cienfuegos, who testified that PUIG had spoken to him after he met Plaintiff and that PUIG told him that Plaintiff offered to take him out of the country.

69.     VALDES and PUIG falsely identified CORBACHO DAUDINOT as having offered to take PUIG out of the country.

70.     VALDES testified that she wanted to do the right thing by informing the authorities and therefore felt that she adopted the appropriate measures by informing MARTINEZ, who immediately spoke ANGARICA, the coach of the baseball team in Cienfuegos. The Cuban court commended VALDES and her efforts, her eagerness and her actions, which it said, demonstrated to the court that she was "*íntegra*", an upstanding citizen.

71.     The Cuban court also complemented PUIG on his frank, open, and ample assistance in bringing the case to the authorities and with providing detailed accusations against the Plaintiff.

72.     PUIG falsely testified that Plaintiff said that PUIG would leave Cuba to go to the Dominican Republic, where they would pay PUIG a certain amount of money, and they would take him out of the country by taking PUIG to the coast, and taking him away by speedboat as soon as the tide was low. PUIG further testified that OROZCO handed him a mobile phone to which a man who lived abroad would call him in order to speak to him about leaving Cuba. PUIG declared that the pin on the phone was 7124.

73.     PUIG falsely testified Plaintiff had a plan to take four other players who PUIG knew out of the country along with PUIG. PUIG stated that Plaintiff said those players were already waiting for him in a safe house and that they were only waiting for PUIG to join them before they would leave, but the names of those players were not provided by PUIG and the court never produced proof of any other players..

74.     In addition to the testimony plainly given by the Plaintiffs and the witnesses (MARTINEZ and ANGARICA) that testified as to what PUIG and VALDES told them, the Cuban government presented the *Fototabla Ilustrativa*, which is photographic evidence of PUIG picking out a picture of CORBACHO DAUDINOT from a photo lineup as the person who offered to take him out of the country illegally. Please find attached as "**Exhibit D**", the *Fototabla Ilustrativa*, the photographic evidence that was used in the Cuban trial, depicting PUIG choosing CORBACHO DAUDINOT from a photo lineup as the perpetrator of the act of Human Trafficking for which he was convicted.

75.     The testimony of VALDES, MARTINEZ, and ANGARICA make clear that Defendants worked diligently and exhaustively prior to Plaintiff's arrest to ensnare and identify as many people as they could to claim that they were attempting to take PUIG out of the country.

76.     CORBACHO DAUDINOT filed an appeal and a review of his sentence, which was denied.

77.     There are no further appeals or legal recourses CORBACHO DAUDINOT can make inside Cuba to redress his situation.

## TORTURE OF CORBACHO

78. Because CORBACHO DAUDINOT had expatriated to the Dominican Republic, and because he had been accused and then convicted of Human Trafficking of an athlete, the Cuban government has subjected CORBACHO DAUDINOT to the treatment reserved for enemies of the state or dissidents, rather than those reserved for common criminals.

79. From the outset, the government has treated CORBACHO DAUDINOT as a Cuban citizen when it was convenient and as a foreigner when it did not suit its purposes to treat him as a Cuban citizen.

a. Like foreigners, he was forced to pay for his own attorney using the Cuban Convertible peso, rather than Cuban pesos as all citizens are allowed, which drastically increased the cost of his defense.

b. Unlike foreigners, he was not allowed to visit a foreign consulate, nor is he allowed extradition.

c. Like foreigners, he was transferred without notice to a prison in Cienfuegos, which is outside of Havana and far away from his family, unlike the customary treatment for Cuban citizens, which is to leave them in the province where their families reside.

d. Unlike foreigners, he is held with general population, rather than the prisons designated for foreigners.

80. In prison, CORBACHO DAUDINOT has had to suffer the following:

a. Random beatings

b. Punishment of Solitary confinement in dank, windowless cells that he shares with rats and roaches and which have no mattresses or blanket when family members have complained about his treatment, his living conditions, or his sudden transfers.

c. Being fed food that is spoiled, rotting, and covered in maggots.

d. Prolonged deprivation of sun and open air for up to six months at one time.

e. Regularly confined for twenty three (23) hours a day in a 4 foot by 6 foot prison cell with up to five other prisoners to the point where his skin became mottled and blotchy.

f.   Unsanitary conditions, where four to six men share the same cramped hot cell, are fed rotting food, and must relieve their bowels and bladders in a hole on the ground of the cell. No toilet paper, sanitary napkins or even scraps of cloth are provided.

g.   Denied adequate medical care, despite being a very sick man.

h.   Allowed visitors for only one hour every month.

i.   Confiscation of food or treats brought to him by his family.

j.   Arbitrary transferred to a prison away from his family, who are the only ones that supply him with whatever inadequate medication they can gather to treat his medical conditions.

81.   CORBACHO DAUDINOT is now an extremely sick man, who is constantly afraid and nervous. He is paranoid, he cannot sleep and he does not enjoy life. He lives with the constant awareness that he has no rights, that anything he does can be construed as evidence of a crime, and that his very life can be taken from him at any time.

THE DEFENDANTS' INITIAL ACCUSATIONS, DECLARATIONS, AND TESTIMONIES

82.   In Cuba, before a criminal investigation is underway, a citizen or some other person must make a *denuncia* or denunciation, which is a reporting of a crime or the making of an accusation against the suspect. Please see "**Exhibit E**", British Embassy, Havana Consular Section, *Information for British Nationals Imprisoned in Cuba*, *available at* ukincuba.fco.uk/resources/es/world/doc1/Pris-Con (last visited on July 31, 2012), p. 6

83.   On or about January 15, 2010, PUIG spoke with his mother about the conversation that he had with OROZCO. PUIG and his mother, hoping to improve PUIG's standing with the government, decided to contact authorities in order to get guidance from them as to what to do.

84.   All official sporting activities in the municipal, provincial, and national levels, be they in schools, for minors or in "amateur" teams for any and all sports are organized by the National Institute of Sports, Physical Education and Recreation (*Instituto Nacional De Deportes, Educación Física, y Recreación*) ("INDER")

85.    On January 15, 2010, PUIG and VALDES spoke about OROZCO's conversation with PUIG. VALDES and PUIG, who wanted to get PUIG out of the developmental team and back into the National Series team and the Cuban national team, agreed to tell the authorities that PUIG was being offered to leave the country illegally.

86.    On or about January 15, 2010 VALDES went to report to MARTINEZ, the INDER's Deputy Director of the Provincial Sports in Cienfuegos, that Plaintiff and other men had offered to take PUIG out of Cuba illegally.

87.    While VALDES was reporting to MARTINEZ, PUIG himself spoke to another authority of the INDER, ANGARICA, the coach of the National Series team in Cienfuegos, about being offered to illegally leave the country.

88.    The deputy director and the coach for the Cienfuegos team were the men best situated to help PUIG in his predicament in terms of getting the sanctions against PUIG removed.

89.    After having informed the authorities of the offer to leave the country, the DCSE became involved. VALDES and PUIG worked with the DCSE in order to string along the Plaintiff, OROZCO, and any other individual that could have been be involved. PUIG stated that OROZCO provided him with a cellular phone and that a man from abroad would be calling PUIG and that OROZCO would be returning to Cienfuegos to visit PUIG.

90.    PUIG stated to the DCSE that he received four (4) separate calls to the cellular phone the OROZCO gave him, which he kept charged and on his person during the days following the meeting with Plaintiff on January 12, 2010. Two (2) of the calls were from a man living abroad, who PUIG claimed wanted to speak to him about leaving Cuba. During those conversations, PUIG did not commit to anything, but did not discourage the man from continuing his attempts. Two (2) other calls were from OROZCO, who also attempted to persuade him to leave Cuba. PUIG was evasive during those conversations, neither committing to leave nor discouraging the men's continued attempts to persuade him.

91.    On January 18, 2010, OROZCO returned to Cienfuegos looking for PUIG. He called PUIG over the telephone to speak to him and persuade him to abandon the country. He told PUIG that he was in Cienfuegos and in the vicinity where he could be found.

92.     As soon as PUIG hung up with OROZCO, he informed the authorities that OROZCO was looking for him and informed them of his whereabouts, at which point the DCSE arrested OROZCO on the scene.

93.     On January 22, 2008, PUIG, after having accused CORBACHO DAUDINOT and OROZCO of the crime of Human Trafficking, PUIG went to the local DCSE office to put his accusations into a written declaration and to sign them.

94.     During his DCSE declaration PUIG reported an elaborate plan, where he falsely claims that CORBACHO DAUDINOT and OROZCO had several of PUIG's friends hiding out in a house somewhere, waiting for PUIG to join them, before the Plaintiffs would take them out of the country via speedboat when the tide was low.

95.     PUIG's declaration states that he first met CORBACHO DAUDINOT on January 12, 2010 and described his physical appearance as that of a Black man with fine features. Other than on the one occasion on January 12, 2010, PUIG never again saw or heard from CORBACHO DAUDINOT.

96.     Just as in her court testimony, which accuses Plaintiff plainly of offering to take PUIG out of Cuba illegally, VALDES 's January 27, 2010 declaration concurs with that of her son's as to the visit by CORBACHO DAUDINOT and OROZCO and states that they offered to take PUIG illegally from Cuba, an offer which, she stated PUIG would never accept. VALDES declared that she immediately went to contact the authorities to report on CORBACHO DAUDINOT and OROZCO.

<u>PUIG'S DEFECTION</u>

97.     In Cuba, there are no professional athletics; all sports are considered amateur, even if the players and teams dedicate themselves solely to that sport. Athletic prowess, teams and athletes are considered a source of national pride and a success of the Cuban revolution.

98.     Athletes, as a source of national pride and representatives of the success of the revolution, are punished for wrongdoing by sanctioning or banning them from playing the sport in which they distinguish themselves.

99.     Athletes, who attempt to flee the island, are generally removed from the National Team and suspended from the National Series for a period of two years. Other Cuban baseball

superstars, like Yadel Marti and Yasser Gomez, were suspended from the National Team and the National Series when they tried to defect in November 2008, and extraordinary players like Orlando "El Duque" Hernandez ("El Duque"), received a lifetime suspension for simply accepting money from an American agent. El Duque had previously been suspended from both the National Team and National Series because his brother, Livan Hernandez (also a major league baseball player) had defected.

100.    Aside from the suspensions and bans faced by baseball players who attempt to escape Cuba, these athletes are arrested for attempting to leave the country illegally and are sometimes sentenced to jail time because of their attempts. Another Cuban-born baseball sensation, Jose Fernandez, who is the starting pitcher for the Miami Marlins and who was chosen to play in the All-Star game in 2013, was arrested attempting to leave Cuba illegally and served one year in prison there. In Cuba, Fernandez had pitched in three national championship games by the time he was fourteen years old. Despite his obvious talent and the repercussions he suffered, Fernandez continued his attempts to escape, rather than easing his situation by working with the government as did PUIG and Aroldis Chapman, another Cuban baseball player, who testified in Cuba against five (5) men, who were accused of Human Trafficking.

101.    PUIG had experience with the Cuban government's form of punishments and doling out justice. Prior to his accusations against Plaintiff in January 2010, he had been sanctioned by the government and relegated to the developmental team in Cienfuegos, despite being an award-wining baseball player, who helped Cuba win the bronze medal at 2008 World Junior Baseball Championship and having played in the Cienfuegos National Series team since his debut season of 2008-2009.

102.    Immediately after PUIG accused the CORBACHO DAUDINOT and OROZCO of offering to take him out of Cuba, he was reinstated into the National Series baseball team for Cienfuegos. He was also reinstated into the Cuban national baseball team, which travels outside of the island.

103.    It was as part of the National Team that PUIG traveled to the 2011 World Port Tournament in Rotterdam, the Netherlands and attempted to make his escape, just as pitcher Aroldis Chapman had successfully done in 2009. PUIG's escape attempt was thwarted, and he was once against suspended from playing baseball.

17

104.    Being part of the INDER system and having already engaged in the conspiracy alleged in this complaint, PUIG knew that the Cuban judicial system was based on fabrications and political expediency. In April 2012, PUIG told Carlos Torres, a Coast Guard interpreter who was on the cutter that picked PUIG up after an escape attempt, that the authorities "would again find him derelict in duty to his country, could trump up some charges on him and send him away," and that he'd heard of other players who went to jail for years and lost their careers. Please see "**Exhibit F**" Jeff Passan, Coast Guard crew reflects on time with Yasiel Puig during attempt to defect to U.S., July 2, 2013, *available at* http://sports.yahoo.com/news/coast-guard-crew-reflects-on-time-with-yasiel-puig-during-attempt-to-defect-to-u-s--141306377.html     (last visited on July 18, 2013).

105.    PUIG had decided to leave Cuba prior to 2010 and had been sanctioned as a result of his suspicious behavior. He was removed from the National Team and relegated to the developmental team, rather than the National Series, despite his phenomenal record.

106.    PUIG's determination to leave the country in order to play baseball professionally outside of Cuba led to his methodical subterfuge, which centered on clearing his name by demonstrating his loyalty to the state, which he accomplished by reporting to ANGARICA and becoming an informant for the DCSE, and reporting and testifying against CORBACHO DAUDINOT. His plan was carried out with the aid and active participation of his mother, VALDES, who, as part of the conspiracy, reported to MARTINEZ, deputy director of the Provincial Sports in Cienfuegos that Plaintiff was offering to take her son out of the country illegally, and then reporting to the DCSE and testifying against Plaintiff in court.

107.    Despite his and his mother's testimony about having no intention of leaving the country, PUIG attempted to defect from Cuba in June 2011, just seven months after his testimony.

108.    After PUIG was caught trying to escape from the World Port Tournament in Rotterdam, Netherlands in June 2011, he was once again sanctioned. PUIG and VALDEZ once again attempted to divert suspicion from himself and to get those sanctions lifted by accusing at least two (2) other men of offering to take PUIG out of the country illegally.

109.    PUIG and VALDES accused at least two (2) other men of Human Trafficking. Those men spent some months in prison, but had to be released and the charges against them had

to be dismissed when, prior to realizing a trial in their case, PUIG left Cuba illegally in June 2012.

HUMAN TRAFFICKING IN CUBA

110.    Every year the United States' Department of State produces an annual Trafficking In Persons Report. Every year since 2003, the United States in its report publicly accuses Cuba of condoning, perpetuating, and profiting from the Trafficking of Persons. The 2008 report contained the fifth such accusation, but not the last, as Cuba is still considered to be a hub of human trafficking. See "**Exhibit G**", U.S. Department of State, *2008 Trafficking in Persons Report* , pp. 102-103, *available at* http://www.state.gov/documents/organization/105501.pdf.

111.    Cuba strongly condemned and continues to condemn the accusations contained in the reports, and launched a verbal attack against the United States, accusing the United States of promoting smuggling of Cuban citizens.

112.    Cuba began a campaign of accusing and condemning American citizens and residents, mostly Cuban-Americans, of committing an offense under Cuban Penal Code 347.2, Trafficking in Persons, which states in relevant part that "any person, who is not so authorized and with the purpose of making money, organizes or ***promotes*** the exiting of the national territories of persons who are in the country for a destination to third parties" is guilty of Trafficking in person and shall be liable to sentences of between seven (7) to fifteen (15) years. [emphasis added]

113.    The statute is so vaguely written as to apply to almost any interpretation, as the word "promote" within the law has been loosely applied to meet almost any conversation in which an accused may engage, and the law itself has been applied as a panacea to any and all cases that lack any physical and sometimes even testimonial evidence, including the case of a Cuban-American man, Yamil Dominguez, who was accused and condemned to ten (10) years in a Cuban prison under this statute for allegedly seeking to smuggle his girlfriend out of Cuba, something which clearly does not fit the plain meaning of the statute as there would be no fiscal remuneration involved in attempting to smuggle out his own girlfriend.

## CUBAN POLICIES DEALING WITH CUBANS LIVING ABROAD

114.  According to the Department of State's Bureau of Consular Affairs, Cuba maintains a totalitarian state, which relies on repressive methods control over the population, including severe physical and electronic surveillance as well as arbitrary detentions and arrests.

115.  Cuba does not recognize the Dual Nationality or Residency of its citizenry, even of U.S. Citizens or residents born in Cuba, and the Bureau of Consular Affairs warns Cuban-American citizens, who travel to Cuba, that the travelers will be treated as a Cuban citizens, subject to Cuban laws.

116.  The Bureau of Consular Affairs further warns Cuban-Americans that, as travelers to Cuba, they may even have their passports confiscated, be forced to apply for permission to exit the country, or even be compelled by authorities to sign repatriation documents and will be denied U.S. consular services if arrested. Please see "**Exhibit H**", Department of State's Bureau of Consular Affairs, *Country-Specific Information for Cuba*, available at http://travel.state.gov/travel/cis_pa_tw/cis/cis_1097.html (last visited on August 7, 2012).

117.  Cuban-Americans, just as any Cuban with dual citizenship or dual residency, traveling to Cuba are subjected to inconsistent treatment, where they reside in a legal limbo, exposed to the same kind subjugation as all other Cuban citizens, but denied any of the privileges other Cubans enjoy, such as free healthcare and attendance within the Cuban hospitals provided for its citizens.

## THE CUBAN GOVERNMENT'S PRACTICES OF ARRESTS AND IMPRISONMENT

118.  The Ministry of Interior is the principal entity of state security and totalitarian control. Officers of the Revolutionary Armed Forces (FAR) have been assigned to the majority of key positions in the Ministry of Interior in the past several years. In addition to the routine law enforcement functions regulating migration, controlling the Border Guard, and the regular police forces, the Interior Ministry's Department of State Security investigates and actively suppresses political opposition and dissent. It maintains a pervasive system of surveillance through undercover agents, informants, rapid response brigades ("RRB"), and neighborhood-based Committees for the Defense of the Revolution ("CDR"). The Government traditionally uses the CDR's to mobilize citizens against "dissenters," impose ideological conformity, and root out "counterrevolutionary" behavior. Please see "**Exhibit I**", US Department of State: Country

Report on Human Rights Practices 2010, April 8, 2011, *available at* http://www.state.gov/documents/organization/160160.pdf.

119.     The lack of human rights in Cuba is universally known and amply chronicled. The 2010 edition of the Country Reports on Human Rights Practices, which was submitted to the Congress by the U.S. Department of State, describes the Cuban governments disregard for their own Constitutionally mandated rules of procedure in the course of criminal detention. As much as 64 percent of pretrial detainees have spent weeks, months and sometimes, years without having ever seen an attorney or being informed of the charges against them. Bail is rarely granted and detainees have been held for months or years in investigative detention, where detainees can be interrogated at any time and have no right to request the presence of counsel. See *id*. See also, "**Exhibit J**", Cuban American Bar Association, *Law of the State v. State of Law*, 2011,                    p.                    8,                    *available                    at* http://www.cabaonline.com/pdf/CABA%20Annual%20Human%20Rights%20in %20Cuba%20Report.pdf.

120.     Judicial Tribunals also disregard the constitutionally mandated treatment of accused persons by placing the burden on the defendant to prove innocence rather than on the prosecution to prove guilt, and in fact, Tribunals frequently find accused individuals guilty of "potential dangerousness", which requires the commitment of no crime at all, but instead is determined to be a special proclivity to commit crimes, which is demonstrated by the accused's conduct in manifest contradiction of socialist norms. Please refer to Exhibit I.

121.     The report illustrates the detainment facilities deplorable state as follows:

Prison conditions continued to be harsh and life threatening. Food shortages were widespread, available food was often spoiled or infested with vermin, and many prisoners relied on family parcels of up to 30 pounds of food and other basic supplies that were brought during each visit. Prison cells lacked adequate water, sanitation, space, light, ventilation, and temperature control. Running water was rare and, if available, generally ran only for a limited time. Water for drinking and bathing was foul and frequently contaminated with parasites. Many prisoners reported receiving only one small glass of water per day, even when confined to sweltering cells during the summer. Vermin and insect infestations were common, with inmates reporting rats, cockroaches, fleas, lice, bedbugs, stinging ants, flies, and mosquitoes. Prisoners reported that they lacked access to basic and emergency medical care, including dental care.

Prison cells were overcrowded, requiring prisoners to sleep on the floor and limiting freedom of movement during the day. Prisoners, family members, and nongovernmental organizations (NGOs) reported inadequate health care, which led to or aggravated hypertension, diabetes, heart conditions, asthma, skin disease, infections, digestive disorders, and conjunctivitis, among other maladies. The Cuban Commission for Human Rights and National Reconciliation (CCDHRN) reported multiple prison deaths from heart attacks, asthma attacks, and other chronic medical conditions, as well as from suicide. pp. 3-4.

122.    According to Cuban law, police or any non-specified authority may carry out warrantless arrests of anyone accused of a crime against state security or of a crime that "has produced alarm or has been committed frequently in the municipal territory." Please refer to Cuban Criminal Procedure Code, Article 243.

123.    Cuba's Criminal Procedure Code allows the police and prosecutorial authorities to hold a suspect for a week before any court reviews the legality of the detention. According to their written procedures, during the first week after an arrest, the police may detain the suspect for up to twenty-four hours (Cuban Criminal Procedure Code, Article 245). The prosecutorial investigator (*instructor*) then may keep the suspect in custody for an additional seventy-two hours, while deciding whether to pass custody of the suspect to the prosecutor (*fiscal*) or release him or her (Cuban Criminal Procedure Code, Article 246). The law grants the prosecutor an additional seventy-two hours to send the accused to jail, release him or her, or impose less-severe restrictions. Only if the prosecutor chooses to imprison the accused or impose other restrictions does a court review the legality of the detention (Cuban Criminal Procedure Code, Article 247). Please see "**Exhibit K**", Human Rights Watch, *Cuba's Repressive Machinery Human Rights Forty Years After the Revolution*, June 1999, Section III, p. 12-13, *available at* http://www.hrw.org/reports/1999/cuba/.

124.    Despite what is clearly written in its own code, however, in practice Cuban officials often disregard their own legislative policies with impunity. *Id.*, p. 2.

125.    The investigatory period, called the preparatory phase (fase preparatoria), begins after the suspect has been arrested and officials begin to gather evidence to establish the facts of a particular incident. This phase is controlled by the Public Prosecution Service (PPS), but the enquiries may be carried out by the police inspector, the Department of State Security, or directly by the public prosecutor. Please refer to Exhibit E, p. 6.

126.    While the preparatory phase should not exceed 60 days, it may be extended to a period of six months at the request of the inspector-in-chief. After six months, the case must be handed to the prosecutor, irrespective of progress, who may rule on a further period for completion of the preparatory phase. There may be no fixed limit for this extension and there is no right of appeal. The preparatory  phase can take between 12 and 14 months to complete in serious cases**.** See *id*.

127.    Throughout the preparatory phase a suspect may be interrogated as often as necessary and kept in a holding cell or prison as if he had been formally charged with a crime. According to Cuban law, a suspect does not have the right to an attorney at this point of the proceedings because he or she has not been formally been charged with a crime because a central juridical assumption of the Cuban system is that no criminal case exists until the preparatory phase has demonstrated that a crime has been committed. Please see "**Exhibit L**", Michalowski, R. and State University of New York at Albany, School of Criminal Justice, *World Factbook of Criminal Justice Systems: Cuba*, 1997, *available at* https://www.ncjrs.gov/pdffiles1/Digitization/169639NCJRS.pdf.

128.    Even if the Cuban authorities were to comply with their Rules of Procedure, the Criminal Procedure Code grants judges broad latitude in determining whether to hold suspects in pretrial detention. Judges often abuse this authority with respect to government critics, such as the four members of the Internal Dissidents' Working Group who spent well over a year in pretrial detention without charge. Please refer to Exhibit K, Section III, pp 12-13.

129.    The law requires pretrial detentions when two vaguely defined circumstances occur simultaneously: the judge is aware of "actions showing the existence of a deed that has the characteristics of a crime," and "sufficient reasons to suppose criminal responsibility for the crime by the accused, independent of the depth and quality of proof required." (Criminal Procedure Code, Article 252(1) and (2). Translation by Human Rights Watch). This provision sets a very low standard of proof for holding a suspect in pretrial detention. The law also fails to justify the deprivation of liberty on the grounds of the severity of the crime or the likelihood a suspect would flee, foregoing less severe measures that also would ensure that a suspect appears at trial. See *Id.*

130.     But arbitrary arrests and prolonged detentions are not the only violations of the Criminal Procedural Code committed by the authorities. The authorities are also reported to frequently hold expedited trials, in which a suspect is arrested and tried and sentenced in a matter of days, sometimes in a matter of hours, without being provided with counsel and in close door trials. Please see "**Exhibit M**" The Inter-American Commission On Human Rights, *2011Annual Report*, Chapter 5, p. 19, *available at* http://www.oas.org/en/iachr/docs/annual/2011/TOC.asp (last visited on August 13, 2012).

131.     In March and April of 2003 nearly 80 members of civil society were arrested. They were tried and sentenced to very long prison terms ranging from 6 to 28 years. Those arrested were tried in very short order - a few weeks, or even a few days, in trials that lasted less than a day and were not open to the public. Many defendants were not informed of the charges against them or allowed to see a lawyer until the day of the trial, as in the case of journalist Manuel Vázquez Portal. The accused were assisted by counsel who did not belong to an independent bar association. They were subsequently held in conditions affecting their physical and mental health. Please see "**Exhibit N**", International Commission of Jurists, Country Report on Cuba, *Attacks on Justice 2005*, July 11, 2008, pp. 7-9, *available at* www.unhcr.org/refworld/pdfid/48a9281a2.pdf; and **"Exhibit O",** Situation of human rights in Cuba: Report submitted by the Personal Representative of the High Commission for Human Rights, Christine Chanet, E/CN.4/2005/33, 4, January 2005, *available at* http://ap.ohchr.org/documents/sdpage_e.aspx?b=1&s=59&t=9.

132.     On April 2, 2003, eleven Cubans were arrested after having allegedly hijacked a passenger ferry and forced the crew to sail towards the United States. Six days later on April 8, 2003, the Defendants were summarily tried and sentenced to death, life imprisonment or a range of prison terms. After the Defendants filed an appeal, the Supreme Court approved the Sentence, and the Council of State approved the sentence of the men scheduled for execution. Nine days after the initial arrest, on April 11, 2003, three of the accused were executed. *Id*.

133.     According to the Cuban Code of Criminal Procedure, the accused in these circumstances should have benefited from a minimum of 20 working days to prepare their defense (art. 283) but, the trials were held, and all remedies exhausted, within the space of a week. *Id*.

<u>LACK OF REPRESENTATION AND IMPARTIALITY IN THE CUBAN LAW COURTS</u>

134.    The Cuban legal system is run solely under the will and direction of the President of Cuba, Raul Castro, and is based on the concept of socialist legality. Laws are interpreted and applied in whatever manner is required to achieve the socialist goals as defined by the Communist Party of Cuba ("PCC").

135.    According to the Cuban Constitution of 1992, Articles 121, 122, the Judiciary is subservient to the political branches of government and there are no independent courts to adjudicate issues of law and fact or to challenge government acts or the use of government power in any way. Laws are not enforced uniformly or at all, especially as they concern individual rights available to Cubans. Please see "**Exhibit P",** Patallo Sánchez, Laura, Institute for Cuban and Cuban-American Studies, University of Miami, *Establishing the Rule of Law in Cuba*, 2003, pp. 3–6, *available at* http://ctp.iccas.miami.edu/Research_Studies/LPatalloSanchez RuleofLaw.pdf; See also, "**Exhibit Q**", a copy of the Cuban Constitution as translated by Cuba as translated by CUBANET.ORG, http://www.cubanet.org/ref/dis/const_92_e.htm (last visited on August 9, 2012).

136.    Article 121 specifically states that "The courts constitute a system of state bodies which are set up with functional independence from all other systems and they are only subordinated to the National Assembly of People's Power and the Council of State." Please Refer to Exhibit Q.

137.    Article 62 of the Cuban Constitution states in relevant part that "None of the freedoms which are recognized for citizens can be exercised… contrary to the existence and objectives of the socialist state, or contrary to the decision of the Cuban people to build socialism and communism. Violations of this principle can be punished by law." This amendment, in conjunction with Articles 121 and 122, effectively give the individual no guaranteed rights or indicate any specifically prohibited behavior since any behavior may be punished if it is deemed to run contrary to the Communist Party. Please refer to R1; See also, "**Exhibit R"** Human Rights Watch, *New Castro, Same Cuba*, November 2009, p. 32, *available at* http://www.hrw.org (last visited on August 13, 2012).

138.    Cuba currently rejects both separation of powers and judicial review and concentrates virtually all power in the Council of State and the Council of Ministers.

139.    Additionally, the Law of Popular Tribunals (Law 82) states that courts "are obligated to comply with … the instructions of a general nature originating from the Council of State," which is Cuba's 31-member executive body, which is presided over by President Raul Castro. Please see "**Exhibit S**", Law of the Popular Tribunals, *Gaceta Oficial de la Republica de Cuba*, No. 82, 1997, http://www.gacetaoficial.cu/html/tribunes populares.html (last visited on August 9, 2012).

140.    Article 127 of the Cuban Constitution states that the Attorney General of the Republic is:

> the state body which has, as its fundamental objective, jurisdiction over the control and preservation of legality by ensuring that the Constitution, the law and other legal regulations are strictly obeyed by state agencies, economic and social entities and citizens; and representing the state in the promotion and exercise of public legal action.

> Refer to Exhibit Q.

141.    Article 128 of the Cuban Constitution states that the Attorney General "is only subordinated to the [National Assembly] and the Council of State" and that he or she "is given instructions directly from the Council of State." *Id*

142.    Article 129 of the Cuban Constitution states that "the Attorney General of the Republic and the assistant attorney generals are elected and subject to recall by the National Assembly of People's Power." *Id*.

143.    Article 130 of the Cuban Constitution states that "the Attorney General of the Republic renders an account of his work to the [National Assembly] in the form and with the periodicity established by law." *Id*.

144.    So, while the constitution grants the Attorney General that independent power to oversee and guarantee the uniform enforcement of the constitution and the laws, those powers are necessarily voided by Articles 128, 129 and 130, which state Cuba's highest legislative body, the National Assembly of People's Power ("National Assembly"), has the authority to appoint and dismiss members of the Supreme Court, the attorney general, and all deputy attorneys general, and that the Council of the State, Cuba's highest executive body and the center of all

governmental power in that country, has the authority give the Attorney General, and by extension the entire juridicary, direct instructions. Refer to Exhibit R, p. 34.

145.    Under the constitution, judges and prosecutors must report at least once a year to the National Assembly, which retains the authority to remove them at any time. *Id*.

146.    Similarly, municipal and provincial assemblies are empowered to receive reports from the respective judiciaries and can appoint courts, and dismiss judges and prosecutors. *Id*.

147.    The process by which judges and prosecutors are appointed and removed undermines the security of tenure as well as judicial and prosecutorial independence.

148.    As detailed in the *Law on the Organization of the Judicial System* "active revolutionary involvement" is a pre-requisite for judicial appointment and only government supporters are selected as judges, which explains why a majority of the Supreme Court judges are members of the Cuban Communist Party.

149.    Under Article 4 in Title I - Principles And Warranties Of The Judicial System, of the Law of Popular Tribunals (Law 82), among the principal objectives of judicial courts are to first "implement and enforce socialist legality;" to "safeguard the economic, social and political provisions of the Constitution;" to "prevent violations of law and antisocial behavior, suppress and reeducate those who engage in them and restore the rule of law when the rules have been violated;" to "raise the social legal consciousness in the sense of strict compliance with the law in their decisions by making the appropriate statements to educate citizens in the conscious and voluntary observance of their duty of loyalty to their country and respect the social rules." Refer to Exhibit S.

150.    In short, the objectives of the courts, as established by Cuban law, is to enforce the communist objectives of the state by implementing and enforcing "socialist legality", by safeguarding the "*political*" provisions of the Constitution, by *preventing* violations of law and "*antisocial behavior*", to "*reeducate*" those who have committed "antisocial behavior", and to "educate" citizens in the observance of their "duty of loyalty to their country"

151.    Title I, Article 5 of the Law of Popular Tribunals (Law 82) states that in addition to complying with the Constitution and other laws of Cuba, the courts "are obliged to obey…the

general instructions from the Council of State, which is received through the Governing Council of the Supreme Court". *Id.*

152.    With the above-listed objectives and directives, it is no surprise then that Prosecutors are allowed to rely on hearsay evidence from members of the Committees for the Defense of the Revolution concerning the revolutionary background of defendants. Such evidence has been taken into account as an aggravating or mitigating factor during sentencing. Please refer to Exhibit I, p. 11; Exhibit K, Section VIII, p. 2-3.

153.    According to Article 135 of the Cuban Constitution, the National Assembly is determined by direct elections held every five years in which all Cuban citizens over the age of 18 have a right to be elected.  Refer to Exhibit Q.

154.    But the electoral process is undermined by a 1992 Electoral Law that requires that the number of candidates on the ballot for the National Assembly equal the number of open positions. And to determine the candidates—one for each open position—a short list is drawn up by the National Commission for Candidacies, which made up of representatives from all of the major official mass organizations, such as the Cuban Workers Federation (CTC), the Federation of Cuban Women (FMC), Committee for the Defense of the Revolution (CDR), National Association of Small Farmers (ANAP), Federation of University Students, and Federation of Secondary School Students (FEEM). Please see "**Exhibit T**", Jorge I. Dominguez, *Government and Politics in Cuba: A Country Study*, 2002, p. 234, *available at* http://www.people.fas.harvard.ehttp://www.people.fas.harvard.edu/~jidoming/images/jid_govern ment.pdfdu/~jidoming/images/jid_government.pdf.

155.    Since the final list of candidates equals the number of number of posts to be filled, those nominated for candidacy are almost certain to be elected.

156.    The organizations responsible for drawing up the short list of nominees are those who are approved and organized by the Communist Party and are an extension of the regime's control. These organizations must receive official recognition from the Cuban government through the process expressed in the Law of Association (Law 54 of December 27, 1985); in accordance with Article 5 of the Cuban Constitution, which states that "the Communist Party of Cuba is the highest leading force of society and of the state, which organizes and guides the common effort toward the goals of the construction of socialism and the progress toward a

communist society," and; in accordance with Article 7 of the Cuban Constitution which states that "the Cuban socialist state recognizes and stimulates the social and mass organizations….These organizations gather in their midst the various sectors of the population, represent specific interests of the same and incorporate them to the tasks of the edification, consolidation and defense of the socialist society." Please refer to Exhibit I, p. 17-18, and; Exhibit P.

157.    But even if the membership of the National Assembly, which only meets for a few days each year, was truly representative of a free and open election, that body does not hold any independent control, but acts merely as a figurehead of "representation", which is subservient to the Council of State. Refer to Exhibit R, p. 35.

158.    The Council of State, a 31-member council that is headed by president Raul Castro, is described by Article 89 of the Cuban Constitution as "the body of the [National Assembly] that represents it in the period between sessions, puts its resolutions into effect and complies with all the other duties assigned by the Constitution. It is collegiate and for national and international purposes it is the highest representative of the Cuban state." Refer to Exhibit Q.

159.    Article 90 of the Cuban Constitution lists the enumerated powers granted to the 31-member council as the power to: summon special sessions of the National Assembly of People's Power; set the date for the elections for the periodic renovation of the National Assembly of People's Power; issue decree-laws in the period between the sessions of the National Assembly; give existing laws a general and obligatory interpretation whenever necessary; exercise legislative initiative; make all the necessary arrangements for the holding of referendums called for by the National Assembly of People's Power; decree a general mobilization whenever the defense of the country makes it necessary and assume the authority to declare war in the event of aggression or to approve peace treaties; replace, at the initiative of its president, the members of the Council of Ministers in the period between the sessions of the National Assembly of People's Power; issue general instructions to the courts through the Governing Council of the People's Supreme Court issue instructions to the Office of the Attorney General of the Republic; appoint and remove, at the initiative of its president, the diplomatic representatives of Cuba in others states; grant decorations and honorary titles; name commissions; grant pardons; ratify or denounce international treaties; grant or refuse recognition

to diplomatic representatives of other states; suspend those provisions of the Council of Ministers and the resolutions and provisions of the Local Assemblies of People's Power which run counter to the Constitution or the law or which run counter to the interests of other localities or to the general interests of the country, reporting on this action to the National Assembly of People's Power in the first session held following the suspension agreed upon; revoke those resolutions and provisions of the local bodies of People's Power which infringe the Constitution, the laws, the decree-laws, the decrees and other provisions issued by a higher body or when they are detrimental to the interests of other localities or to the general interests of the nation; approve its rules and regulations; it is also invested with the other powers conferred by the Constitution and laws or granted by the National Assembly of People's Power. *Id*., Art 90-91.

160.    The president of the Council of State, which is the president of the Nation, currently Raul Castro, is also the president of the Council of Ministers, which is Cuba's main executive body, and essentially wields ultimate power over the executive legislative and judicial branches of government. Refer to Exhibit R, pp 35-36.

161.    There are no independent attorneys in Cuba. The legal profession in the island consists mainly of lawyers who practice in state controlled law firms, prosecutors, and appointed judges who operate strictly within the parameters established by the governments. Lawyers do not operate independently as advocates, but rather, their mandated roles are to advance the goals of socialism as expressed in the socialist laws enacted by the government. *Id*. at 14.

162.    Persecutors are required to have "an extreme revolutionary sensibility" and apply and enforce laws to achieve revolutionary goals" *Id*.

163.    In essence then, all legislative, executive and judicial power is held by Raul Castro. He, along with the other 30 member of the Council of State, have the power to call the National Assembly, declare elections of the National Assembly, remove its members, pass laws, interpret laws, appoint Judges and prosecutors, and declare official organizations.

## CUBA'S PERVASIVE SNITCH NETWORK

164.    The first years after the Cuban revolution, were characterized with fear, violence, and bloodshed. The new Castro regime set up an effective security network that consisted of both

official and unofficial government agents, who would police the populace for anti-revolutionary crimes of deed, dissent, sentiment, or thought. Please refer to Exhibit K, Section VIII, pp. 2-3.

165.    While the police and other security officials would detain arrest, interrogate and prosecute suspected "criminals", the system depended on a larger and more pervasive snitch network throughout Cuba to provide the authorities with denunciations or accusations against individual citizens. *Id*.

166.    This revolutionary system revolved around the Committee for the Defense of the Revolution ("CDR"), and turned neighbor against neighbor. Every community has a CDR, and every street in that community had at least one member of the CDR, whose duty it is to report the activities of his or her neighbors. These activities include the neighbors' visitors, their comings and goings, their overheard conversations with others, their personal conversations with that CDR member and their participation in communist activities. Please refer to Exhibit K, Section VIII, pp. 2-3.; Exhibit R, pp. 92-96; and Exhibit I, p. 13.

167.    The CDR is also responsible for organizing communist activities, gathering all of the residents for pre-planned communist events, and becoming unofficial enforcers of the government's policies, either by warning wayward residents about the consequences of their actions, or by carrying out acts of repudiation, which are public protests held outside the homes of perceived dissidents. As with all governmental acts, they are intended to humiliate and intimidate individuals and have repeatedly resulted in mob violence. Acts of repudiation last anywhere from several hours to a full day and the participants' tactics include yelling insults and verbal threats, banging on pots and pans to create noise, throwing stones at homes and defacing them with insulting graffiti, illegally invading homes, and physically assaulting the inhabitants. Exhibit K, Section VIII, pp.2-3. Exhibit R at 92-96. See also, Exhibit I, p. 2.

168.    Even though such acts of repudiation are allegedly conducted by neighbors, many of the participants are strangers, who arrive at the location of repudiation in state-owned vehicles, such as military trucks or public buses, which indicates that the groups are tightly aligned with the government and take their direction from the Communist party. *Id*.

169.    Many of these state-orchestrated "acts of repudiation" were directed against the Ladies in White ("Damas de Blanco "), a group of mostly female relatives and supporters of

political prisoners, many of those prisoners were arrested in the spring of 2003, later known as "Black Spring". Please refer to Exhibit I, p. 2.[1]

170.    While the CDR is the most visible civilian arm of the government's snitch network, it is not the only human means of surveillance and control of the populace. The Cuban government has also used informants to spy on their neighbors or to pose as dissidents to spy on the activities of unofficial groups that are critical of the state. Please refer to Exhibit K, Section VIII, pp. 2-3; Exhibit R, pp. 92-96, and: Exhibit I, p. 13.[2]

---

[1] On the week leading up to March 18, 2010, the seventh anniversary of the 2003 arrests against the political prisoners of Black Spring, the Ladies in White held daily marches to commemorate the anniversary. On March 16, the government bused in approximately 100 counter-demonstrators who surrounded the Damas and shouted insults and progovernment slogans. On March 17, the Ladies attempted to march through a neighborhood on the outskirts of Havana, but as the march progressed, approximately 300 progovernment counter demonstrators arrived on government buses, surrounded the Ladies, shouted insults, and physically assaulted the marchers. State security officers were observed coordinating with mob leaders. Eventually, the mob completely blocked the path of the Ladies, and police dragged the marchers, the Ladies, onto a waiting bus. Foreign diplomats also observed state security officials drag a male relative of one of the marchers away, then repeatedly kick and punch him. All participants in the march, the Ladies, were detained briefly and then released without charges. *Id.* at pp 2 - 3.

During the first half of 2010, the government also tried to prevent the Ladies from staging their weekly march after Sunday Mass, which they had been doing since their spouses were arrested in 2003. Over the subsequent weeks the crowd of counterdemonstrators swelled in numbers and intensity and police prevented all but a handful of Ladies from reaching the church.

    a.    On April 18, progovernment forces surrounded the Ladies as they left the church and prevented them from marching, screaming insults and obscenities while banging on pots and pans.

    b.    On April 25, they again were surrounded after leaving church, forced into a nearby public park where they were assaulted, taunted, and prevented from moving for more than seven hours until state security officials finally put a halt to the attack and forced the Ladies onto a public bus.

    c.    The standoffs only ended the following week, when Catholic Cardinal Jaime Ortega received assurances from President Castro that the Ladies would be allowed to resume their Sunday marches, indicating that the Castro regime had a hand in these "counter demonstrations". *Id.* at p. 3.

[2] In the trials of the 75 dissidents in 2003, state prosecutors relied on the testimony of infiltrators who had posed as opponents of the government to testify to the counterrevolutionary activities of their former colleagues. Several of the informants had been working clandestinely alongside dissidents for decades and had earned their utmost confidence. In the trials of ten dissidents in

171.    Individual citizens, such as teachers, professionals, and sports figures are undercover informants for the government. Please refer to Exhibit K, Section VIII, pp. 2-3.

172.    All official sporting activities in the municipal, provincial, and national levels, be they in schools, for minors or in "amateur" teams for any and all sports are organized by the National Institute of Sports, Physical Education and Recreation (*Instituto Nacional De Deportes, Educación Fisica, y Recreación*) ("INDER").

173.    The INDER works closely with DCSE and national security. The DCSE maintained a snitch network of athletes, in every team, at every level, in each individual sport. These snitches would report to their individual handlers any tidbit of information they found suspicious.

174.    Only the official to whom the athlete reports knows which athletes act as snitches.

175.    Becoming a snitch for the government is not compulsory, it is voluntary and the benefits for athletes are undisputed. A proven snitch, who actively reports on other players, other citizens, or foreigners within Cuba is classified by the Cuban security as "trustworthy" or "of confidence", and that player will then be watched less closely and allowed to travel. Players who are not "trustworthy" or are not "of confidence" are not allowed to travel.  Please see "**Exhibit U**" Affidavit of Gregorio Miguel Calleiro, former Director of INDER.

176.    Human trafficking, whereby Cuban talent—be it in athletics, art, science, or medicine—is taken out of the island, is considered an offense against the security of the state in Cuba and it is the one which the Cuban government most targets, especially as directed against the country's baseball players from the Dominican Republic and from the United States, making those accusations particularly attractive to ambitious informants.

177.    Athletes, and particularly, baseball players, for which Cuba has become famous, have established a reputation as being particularly prolific informants for the government. In exchange for becoming informants, players are afforded the opportunity to further their careers by being included in the National Series teams as well as in the national baseball team. This quid

---

April 2004, a man who had been posing as a journalist, Manuel David Orrio, revealed himself as a government agent and testified against other nonviolent political activists. *Id*.

pro quo is widely known by its athletes and those exploited by both the players and the government.

178.    Membership on the Cuban national baseball team has unfortunately become a who's who of DCSE snitches or government favorites. As with most things in Cuba, talent, dedication, and skill are not the leading prerequisite to joining the national team, as can be demonstrated by the fact that players, such as Aroldis Chapman and PUIG himself, are kept from the team when their loyalty to the communist regime is called into question, and an incomparable player, like Alexander Guerrero, with a batting record of .338/.408/.641 in 2009, .343/.414/.583 in 2010 and .310/.400/.599 is continually kept off of the roster of the Cuban National baseball team, which led to his refusing to play in the Cuban National Series during the 2012 season.

179.    There are two other related TVPA cases in the Southern District of Florida, Case numbers: 12-CV-21891 and 13-CV-22210, against another Cuban baseball player, Aroldis Chapman, which have facts strikingly similar to this one. When compared side-by-side, a shocking pattern can be detected:

| | |
|---|---|
| PUIG was under sanctions when he made his accusations against the accused on the Cuban case. | Chapman was under sanctions when he made his accusations against the accused in the Cuban case. |
| PUIG accused two men, who he saw driving a tourism car, of offering to take him out of Cuba illegally. | Chapman accused two men, who he saw driving a tourism car, of offering to take him out of Cuba illegally. (each time, he accused 2 men) |
| One of the two men PUIG accused lived abroad, while the other was a Cuban citizen living in Cuba. | One of the two men Chapman accused lived abroad, while the other was a Cuban citizen living in Cuba (both times). |
| PUIG claimed that the men offered him millions of dollars to play baseball abroad | Chapman claimed that they men offered him millions of dollars to play baseball abroad. |
| PUIG claimed that the men told him that they were also planning to take other players PUIG knew with them. | Chapman claimed that the men told him that they were also planning to take other players Chapman knew with them. |
| PUIG claimed that they would take him to a safe house, then to a beach, from where they would leave the island by speedboat. | Chapman claimed that they would take him to a safe house, then to a beach from where they would leave the island by speedboat. |
| PUIG's mother made the initial accusations | Chapman's father made the initial accusation |

| | |
|---|---|
| against the Plaintiff. | against Mena Perdomo. |
| PUIG called the DCSE after being contacted by OROZCO and they arrested OROZCO while he was leaving Cienfuegos. | Chapman called the DCSE after meeting with Curbelo Garcia and Medina and the DCSE attempted to arrest them while leaving Frank Pais. |
| PUIG's was immediately reinstated into the team at Cienfuegos after he made his accusations | Chapman was immediately reinstated into the team at Holguin after he made his accusation. |
| PUIG's mother testified that Plaintiff offered to take PUIG out of Cuba illegally despite acknowledging that she was never privy to any conversation between PUIG and Plaintiff. | Chapman's parents testified that the Plaintiffs in the Chapman case offered to take Chapman out of Cuba illegally despite acknowledging that they were never privy to any conversation between Chapman and the Plaintiffs. |
| PUIG attempted to defect during the 2011 World Port Tournament in Rotterdam, Netherlands | Chapman defected during the 2009 World Port Tournament in Rotterdam, Netherlands. |

180.    Aside from imprisonment, athletes who attempt to flee the island are removed from the National Team and suspended from the National Series for a period of at least two years or they are suspended or banned from whichever sport in they engage, most receiving a two-year suspension or worse.[3]

---

[3] Orlando "El Duque" Hernandez ("El Duque"), received a lifetime suspension for simply accepting money from an American agent.  El Duque had previously been suspended from both the National Team and National Series because his brother, Livan Hernandez (also a major league baseball player) had defected. El Duque was never prosecuted or imprisoned, but was never allowed to play in Cuban baseball again. He fled the island in December 2007, fourteen months after his ban had been issued.

Along with El Duque, Alberto Hernandez, a catcher in the Cuban national League, received a lifetime ban from playing baseball in October 1996 after allegedly accepting money from an American Agent. He was never prosecuted or imprisoned, but was never allowed to play Cuban baseball again. He fled Cuba with El Duque in December 2007, fourteen months into his ban.

German "El Imán" Mesa, former shortstop for the Industriales of the Cuban national League and for the Cuba national baseball team, was banned from Cuban baseball in October 1996 along with El Duque and Hernandez, for allegedly taking money from an American sports agent. He

35

181.    By contrast, PUIG was banned from the baseball for a few months before being allowed back on both the National Series team and the national team.  He was able to accomplish this miraculous feat by becoming a competent informant for the government.

PRISON CONDITIONS IN CUBA

182.    The subhuman conditions endured by CORBACHO DAUDINOT are not unique to his prison, although the worst punishments are generally reserved for dissidents expatriated Cubans, those who refuse to sign repatriation documents or those who to accept the Cuban governments attempts at indoctrination or retraining.

183.    The conditions of Cuban prisons are deplorable for all inmates, but they are particularly harsh for those inmates who are considered dissidents, those who criticize the government, those who complain of their treatment, or those who refuse to engage reeducation.

184.    Many of the human rights abuses that occur in Cuban prisons are tantamount to torture. Please refer to Exhibit I, pp. 3-6; Exhibit K, and; Section VI; Exhibit R.

---

was never prosecuted or imprisoned. His ban was eventually lifted, but only after he had been suspended for two playing seasons.

Yadel Marti, a pitcher for the Cuba national baseball team and the Industriales of the Cuban national Series, was suspended from the National Team and the National Series when he tried to defect in November 2008. He was not prosecuted or imprisoned, but received a lifetime ban. He successfully defected from the island in December 2009.

Along with Marti, Yasser Gomez, a midfielder from the Cuba national baseball team, was suspended from the National Team when he tried to defect in November 2008. He was not prosecuted or imprisoned, but received a lifetime ban. He, along with Gomez, successfully fled the island in December 2009.

On July 22, 2007, Guillermo Rigondeaux Ortiz, a Cuban bantamweight boxer, attempted to defect from Cuba during the Pan American Games in Brazil. However, on August 2, 2007, Rigondeaux was taken into police custody and returned to Cuba, where Fidel Castro declares him to be a traitor and bans him for life from boxing. He was not prosecuted or imprisoned, but was not allowed to participate in the sport. On February 2009, 18 months after his ban from the sport, Rigondeaux escaped from the island with smugglers to Mexico City.

On July 22, 2007, in the company of Rigondeaux, Erislandy Lara Santoya, a Cuban welterweight boxer, attempted to defect from Cuba during the Pan American Games in Brazil. However, on August 2, 2007, he was taken into police custody and returned to Cuba, where the government sentenced him a lifetime ban from boxing. He was not prosecuted or imprisoned, but was not allowed to participate in the sport, which led him to a second defection attempt in March 2008, this one successful, this one using speedboats from the island, which took him to Mexico.

185.     All prisoners are subjected to malnourishment, scarcity of food, inadequate medical care, overcrowded four foot by six foot cells with no air-conditioning or heat, where they stuff anywhere from four to six men to a cell, where they must share a common toilet that is no more than a hole on the floor and for which there is not toilet paper. Please refer to Exhibit I, pp. 3-6; Exhibit K, Section VI, and; Exhibit R, p. 6.

186.     But special horrors are reserved for prisoners like CORBACHO, who is treated like a dissident, because he is an expatriate, who refuses to sign repatriation papers, speaks badly of the regime, complains about the conditions of his confinement, and refuses to engage in reeducation.

187.     Prisoners like CORBACHO DAUDINOT are punished for their dissent by being kept imprisoned in their cells for 23 out of 24 hours a day, by beatings, by arbitrary prison transfers to locations far from his family, by being served food that is spoiled, rotting, and covered in maggots, by being deprived of sunlight for up to six months out of a year, and by being placed in solitary confinement in a dank windowless concrete cell with no mattress or even a blanket when he or his family complain to the authorities about his treatment.

188.     For CORBACHO DAUDINOT the torture is magnified because he was an innocent man. After the abuses he endured, he became a shell of the man, he used to be, frightened of his own shadow, with psychological scarring that has necessitated his continued treatment with a Psychologist in Cuba. He lives in fear of having his freedom taken from him, of being locked in a small, windowless cell, of being forced to eat rotting food, and of never seeing his son, who was only five (5) years old when he was imprisoned for a crime that he did not commit.

189.     Prison guards or groups of common prisoners known as prisoners' councils, which act under the orders or with the acquiescence of prison authorities, punish outspoken Cuban political prisoners with beatings. Refer to Exhibit K.

190.     The conditions described above are well known by the Cuban community at large, as evidenced by news articles published about it inside Cuba, and through well-publicized testimony from prisoners' families, who are left to provide all of the prisoners' necessities any way they can.

DEFENDANTS' AIDING AND ABETTING OF  AND
CONSPIRACY WITH THE CUBAN GOVERNMENT

191.   Heretofore and at the time of the occurrences herein, Defendants had entered into a conspiracy and a joint plan with the Cuban government to effectuate a variety of purposes that were of mutual benefit to Defendants and the Cuban Government.

192.   As indicated above, PUIG, a Cuban baseball star, who was relegated into the developmental team in Cienfuegos as part of official sanctions against him, in spite of being an award-winning athlete, wanted to be reinstated into the Cuban national Series baseball team of Cienfuego and to be included as part of the Cuban national baseball team.

193.   PUIG's goal to reanimate his career would permit him to achieve what Aroldis Chapman did, which was to escape from Cuba, while traveling to a foreign city with the national team, and to sign a multi-million dollar baseball contract with the major leagues.

194.   To that end, PUIG and his mother, VALDES, agreed to become informants for the Cuban governments as soon as the opportunity presented itself. The goal of their conspiracy was made evident by the fact that, before going to the DCSE with what they clearly believed to be incriminating information, they went to the INDER to report Plaintiffs' alleged offer.

195.   In furtherance of the conspiracy, PUIG kept the mobile phone that OROZCO gave him charged and on his person, and did not simply refuse the alleged offers to leave the country, but presented himself as evasive and indecisive about leaving Cuba.

196.   The Cuban government received what appeared to be a competent and prolific snitch in PUIG, who accused of Human Trafficking CORBACHO DAUDINOT and OROZCO, who were convicted for allegedly trying to smuggle him out of the country.

197.   PUIG and VALDES established a relationship with the government, where both sides benefited.

198.   PUIG benefited from the conspiracy and/or by aiding and abetting the government by drawing suspicion away from him, which permitted him to again be allowed on the Cuban national Series baseball team of Cienfuegos and on the Cuban national team, which travels abroad and offered him a better opportunity to escape.

199.    VALDES benefited from the conspiracy by helping to further her son's career, occasion her son's escape, which materially benefits them and their family in Cuba.

200.    Pursuant to the conspiracy, PUIG accused CORBACHO DAUDINOT and OROZCO of plotting to smuggle him out of Cuba on January 15, 2010.  OROZCO was arrested on January 18, 2010, and CORBACHO DAUDINOT was arrested on January 20, 2010.  They were convicted almost nine months later a trial where PUIG testified.

201.    Pursuant to the conspiracy, VALDES accused CORBACHO DAUDINOT and OROZCO of plotting to smuggle him out of Cuba on January 15, 2010.  OROZCO was arrested on January 18, 2010, and CORBACHO DAUDINOT was arrested on January 20, 2010.  They were convicted almost nine months later a trial where PUIG testified.

202.    Pursuant to the conspiracy, PUIG spoke to MARTINEZ, the INDER'S deputy director of All Provincial Sport in Cienfuegos, accusing CORBACHO DAUDINOT and OROZCO of plotting to smuggle PUIG out of the country.

203.    Pursuant to the conspiracy, VALDES spoke to MARTINEZ, the INDER'S deputy director of All Provincial Sport in Cienfuegos, accusing CORBACHO DAUDINOT and OROZCO of plotting to smuggle PUIG out of the country.

204.    Pursuant to the conspiracy, PUIG spoke to ANGARICA, the INDER'S coach for the National Series baseball team in Cienfuegos, accusing CORBACHO DAUDINOT and OROZCO of plotting to smuggle PUIG out of the country.

205.    Pursuant to the conspiracy, PUIG met with the DCSE Counter-Intelligence officials and informed them that CORBACHO DAUDINOT and OROZCO had offered to take him out of the country illegally.

206.    Pursuant to the conspiracy, VALDES met with the DCSE Counter-Intelligence officials and informed them that CORBACHO DAUDINOT and OROZCO had offered to take PUIG out of the country illegally

207.    Pursuant to the conspiracy, PUIG signed a declaration with the DCSE Counter-Intelligence officials stating that CORBACHO DAUDINOT and OROZCO had offered to take him out of the country illegally.

208.     Pursuant to the conspiracy, VALDES signed a declaration with the DCSE Counter-Intelligence officials and informed them that CORBACHO DAUDINOT and OROZCO had offered to take PUIG out of the country illegally.

209.     Pursuant to the conspiracy, VALDES told the DCSE and testified in court that PUIG never intended to leave the country and that he would never do it.

210.     Pursuant to the conspiracy, PUIG told the DCSE and testified in court that he never intended to leave the country and that he would never do it.

211.     In furtherance of that conspiracy, PUIG kept the mobile phone the he claimed OROZCO gave him turned on and with him in order to continue receiving calls from OROZCO and from the man from abroad.

212.     In furtherance of that conspiracy, PUIG kept talking to OROZCO and the man who called him from abroad.

213.     In furtherance of that conspiracy, PUIG pretended to be undecided about leaving Cuba when he spoke with OROZCO or the man who called him from abroad.

214.     Pursuant to the conspiracy, PUIG called the DCSE on or about January 18, 2010 when OROZCO called him from Cienfuegos to tell the authorities that OROZCO was in Cienfuegos.

215.     In furtherance of that conspiracy, PUIG and VALDES testified at CORBACHO DAUDINOT's trial.

216.     The Defendants acted with all due deliberation and premeditation in choosing the Individuals they accused.

217.     As befits the pattern established by other players, Defendants chose persons who were driving tourism car.

218.     At all times PUIG and VALDES knew the CORBACHO DAUDINOT was a resident of the Dominican Republic, because PUIG himself testified that CORBACHO DAUDINOT proposed taking him there. The Dominican Republic is a well-known destination for escaped Cuban baseball players.

219.    At all times PUIG and VALDES  knew that CORBACHO DAUDINOT would not be afforded the rights of a foreigner, but, as a Cuban citizen, would be treated as a dissident. PUIG and VALDES's own testimony identified CORBACHO DAUDINOT as a Cuban citizen, and Human Trafficking is seen as a severe crime against the security of the state.

220.    At all times PUIG and VALDES knew that the sentence for smuggling citizens out of Cuba was a deprivation of liberty in Cuban prison for a period of between seven (7) years to fifteen (15) years. Aside from the fact that the sentence for Human Trafficking is provided by statute, PUIG is an athlete, and, as a specific target of Human Trafficking, the state makes certain it's athletes are aware of the repercussions of that crime. Additionally, in 2010, when PUIG made his accusations, Chapman's own accusations against five different men for human trafficking were more than a year and a half old. As an elite baseball player and part of the INDER, PUIG would have been aware of their result.

221.    At all times PUIG and VALDES  knew of Cuba's disregard for the rules of procedure or prisoner's rights, and that that country's judicial system often leaves prisoners for many months without charges or trial, and that when any trial is granted, those trial rarely adopt any semblance of fairness.

222.    At all times PUIG and VALDES  were aware of the continued "investigation" of the case and that CORBACHO DAUDINOT remained in detention throughout the many months, and that he had not been released from detention before the trial, which took place almost nine (9) months after his detention. CORBACHO's family and friends in Havana had gone to visit PUIG to plead for CORBACHO.

223.    At all times PUIG and VALDES  knew of Cuba's notorious prison conditions, with treatment that is no different than torture and often result in the crippling or death of the inmates. PUIG and VALDES  had personally seen the effects of that inhumane treatment during CORBACHO DAUDINOT's trial, in which CORBACHO DAUDINOT's time in prison had already become apparent.

224.    PUIG and VALDES conspired with the Cuban government to secure CORBACHO DAUDINOT's arbitrary and prolonged detention and torture, acting as catalysts for his arbitrary arrest and impetus for his continued detention and torture.

225.    PUIG and VALDES were the catalysts for and aided and abetted the Cuban government in its arbitrary and prolonged detention and its torture of CORBACHO DAUDINOT, becoming the sole source for the government's actions.

226.    PUIG and VALDES  at all times entered into the conspiracy with the intent or purpose of facilitating the Cuban government to commit arbitrary arrest, prolonged detention, and torture, and the Cuban government did, in fact, commit those acts in the case of CORBACHO DAUDINOT and several other individuals currently residing in Cuban prisons.

227.    PUIG and VALDES at all times aided and abetted the Cuban government to commit arbitrary arrest, prolonged detention and torture of CORBACHO DAUDINOT and others. The Defendants' assistance was indispensable to the Cuban government's commission of the acts and were provided to the government willingly and for the purpose of advancing that government's goals.

<u>**COUNT I**</u>
**TORTURE IN VIOLATION OF TVPA**
**(Against PUIG and VALDES )**

Plaintiff repeats and re-alleges all of the previous allegations set forth in Paragraphs 1-227 of this complaint with the same force and effect as if fully set forth again.

228.    The treatment of CORBACHO DAUDINOT in prison was torture in violation of the TVPA.

229.    The deliberate and frequent acts of torture administered on CORBACHO DAUDINOT were conducted under color of law. Even as CORBACHO DAUDINOT was not afforded all the judicial guarantees which are recognized as indispensable by civilized peoples, the acts of torture were authorized by a Cuban tribunal, and were conducted by government officials, prison guards, and DCSE investigators.

230.    PUIG and VALDES knowingly and substantially assisted the government actors to commit arbitrary prolonged detention and torture, and facilitated the commission of the arbitrary prolonged detention and torture by providing the state actors with accusations against CORBACHO DAUDINOT, occasioning his arrest, prolonged detention, and torture for the almost nine (9) month period leading up to the trial and securing CORBACHO DAUDINOT's continued detention and torture by testifying against him in court.

231.   PUIG and VALDES acted with the intent to assist in the government to commit these acts.

232.   PUIG and VALDES were aware that their acts and omissions assisted and resulted in the arbitrary prolonged detention and torture of CORBACHO DAUDINOT.

233.   Plaintiff has no alternative remedy to redress their injuries other than to file this action. Legal action by Plaintiff in Cuba would be futile, as that country as already demonstrated that CORBACHO DAUDINOT has no rights at all in that country and it has ignored CORBACHO's claims that Defendants had lied. In addition, the Defendants have left that country for the United States and Cuba has no jurisdiction over them.

234.   Further, Legal action by Plaintiff in Cuba could also result in serious reprisals. Individuals who seek redress for the tortuous prison conditions and actions committed against them in prison are subjected to further violence or aggravated conditions in retribution, and CORBACHO DAUDINOT has already experienced such vengeance from the prison guards when his family complained about his treatment there. This system has been well-documented in credible human rights reports by the U.S. Department of State, Human Rights Watch and Amnesty International.

235.   By reason of the torture conducted upon CORBACHO DAUDINOT has suffered both physical and mental conscious pain and suffering and has suffered pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the Plaintiff claims all damages allowed by law, including compensatory and punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, on each and all causes of action in this Complaint on behalf of the Plaintiff against each and all Defendants, jointly and severally, for general and punitive damages in the sum of $12,000,000.00 (TWELVE MILLION DOLLARS), along with interest, costs and disbursements.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all causes of action.

                    By: *s/Kenia Bravo*_____

                        Kenia Bravo, Esq., FBN 68296

                        Avelino J. Gonzalez, Esq., FBN 75530

                        Law Offices of Avelino J. Gonzalez, P.A.

                        6780 Coral Way, Miami, Florida 33155

                        Ph: 305-668-3535; Fax: 305-668-3545

                        E-mail: AvelinoGonzalez@bellsouth.net